How do I say your last name, Counsel? Volpe, Your Honor. Mr. Volpe, please proceed. Thank you. Okay, the idea that that is going to be helpful is completely and utterly absurd. I hope you didn't make it for argument because I'm going to venture a guess that I have the best eyes on the court and I don't have a clue. What's on that board? Your Honor, actually, we did submit to the clerk paper copies of the state. As someone who has some eye issues and stuff, we appreciate that. Your Honor, it's a pleasure to court. I'm Anthony Volpe here on behalf of Bernina, who is the patent owner in this appeal from a final decision of the board in an IPR. By way of background, this has a slightly different twist to it, namely that the inventor is deceased at the time of the IPR. One of the issues that came up was the ability to swear behind a reference that was issued in October. It was not an issued patent. It was a non-examined Japanese patent that published in October of 2002. The original provisional patent application was filed in February 2003. It was asserted by the petitioner as a 102 reference. Our position is that the board failed to appreciate the evidence and failed to appreciate the manner and standard in which the evidence should be reviewed. In our reply brief at pages 16 and 17, we've laid out some dates and some facts. We think that one of the failures of the board was that they were quite concerned about the reliability of the evidence, largely because they focused on a letter written by the inventor prior to being deceased, of course, in May of 2009. They focused on the time period between what the inventor's documents were and this letter of 2009. What they failed to accept or recognize at the time was that the patent application had already been filed. A good deal of this information had already been made part of the public record by the filing of a patent application, so that the gap between the particular information that... when it suddenly became known to be significant, what happened before October 8, 2002 and otherwise. I thought that the board's decision rests ultimately on its view that there was not a complete conception, and by looking at the evidence about the conception, there was at least one thing that was important that was missing, which is how to get the needle motor to operate in accordance with the signals coming out of the motion sensor. And that just wasn't done. And your chief argument was, well, no big deal to figure out how to do that. And the board said, well, yeah, it is kind of a big deal. Well, I think Your Honor is correct. There was a two-part. There was one on the reliability of the evidence. The second was on... and I'll turn to that, which is partially why we have our exhibit here. If the court considers what the actual invention was, I think the board misconstrued the invention. The board viewed the invention as getting the information to the motor of the sewing machine. So, Opie, you've got that blow-up over there. I assume it's a page from the appendix. What page is it? It's two pages from the appendix, actually, Your Honor. The one chart is at... the center part is at 511 and 514. And the right-hand column is 781, 780, and 782. So you have your claim, you have Watabe, and then you have some of your own documents. Yes, Your Honor. And the point here is both Watabe and the 446 patent describe the issue not so much as getting the information to control the needle or the way to control the needle. It was getting information to control the needle because this used to be a hand operation which required coordination between the quilter and a foot pedal. Sort of the old-fashioned Singer sewing machine type arrangement made electronic. What both Watabe and the 446 patent address was a way to try to pick up the information on fabric movement that would remove the responsibility of the quilter to have coordination so that the movement of the fabric could be coordinated with the pedal operation. But what happened in our 446 patent was that the inventor settled on a way that the inventor could pick up the data or the data points necessary to determine whether a fabric was moving fast or slow. Taking that information and moving it into the pedal really was something that was within the state-of-the-art at the time for two reasons. One, it was a digital signal and in 2002, electrical engineers could take a digital signal and convert it if necessary into an analog signal to control the pedal function, the removal of the pedal function. Or if it was a digital function, they could simply use digital circuitry to move it in. Now, the reason that becomes important here is something that we pointed out in our reply brief. After finding that we did not have certain aspects of that circuitry disclosed in our patent application and it was not within the state-of-the-art, the board in a related, the same patent in a second IPR, in a motion for re-hearing on claims that it had denied an IPR trial on, found that it was within the state-of-the-art to take Watabe's disclosure and simply convert it over and combine it with another reference. So they took one standard when they looked at the original 446 patent IPR and said it wasn't within the state-of-the-art. Then they took another standard and that standard is in the appendix on page 1122 where they specifically state... The board specifically states there that Watabe reveals that censors are known and therefore there was no further need to describe censors. Watabe's election not to describe what is known is consistent with applicable precedence. They cite cases and they say, then they go on to say, the point where the invention begins and describes what has been made of the IPR and what they did is new and what it replaces is the old. That which is common and well-known as if it were written out in the patent and delineated in the drawings. And that's exactly what they said we didn't have when they said we failed to disclose the circuitry. But doesn't that all depend on whether it really is... I'm going to use the word non-trivial, but I don't mean anything technical by that to cover whether it had to be part of the conception. How to get a signal that measures the X squared plus Y squared or whatever it is, the actual distance, to make the needle do what you want the needle to do. And there are a couple of... I guess in the discussion with... in the birthday party in August, he says, well, maybe you can use a servo to do this. And the inventor says, I don't really want to do that. I kind of single-shot needles so that as this quilt is moving, the needle is not stuck in it as it's moving. And the initial drawings between invention disclosure number one and invention number two are quite different. The invention number two suddenly has the sensor to see, I don't know, I guess where the rotary is on the position to tell it when to stop, and number one does not, suggesting that there are... there was a problem still to be solved. No, I respectfully disagree, Your Honor. While it may not have been necessarily a pedantic item for someone who just looked at it, for an engineer, for an electrical engineer, you have to understand that people understood how the sewing machines work. They knew that certain sewing machines had one type of mechanical mechanism which was more based on mechanics. They had others that were a little more based... more sophisticated based on electronics, which was actually what drove the inventor to go to the... to the Houston Quilt Show to see what kind of machines he would have to interface with. But for an electrical... What's the evidence that indicates that it was well known in the art to have, I forget what it's called, the sensor that's in the upper right-hand corner, the little angled mirror? I'm kind of remembering more than actually seeing what's within that picture. The little mouse-like device. No, no, not the mouse, not the detection one underneath. In the upper right-hand corner, there's something that's sensing where the little... like a little piece of paper is or something. Oh, that's the shaft position. Shaft position sensor, that's it. Now, what evidence was there before the board that said that mechanism, which I gather is actually part of the mechanism for both the proportional and the single-stitch embodiments, was well known in the art and not something Mr. Kerner came up with after October 14th, I even... I guess the simplest example, Your Honor, I can give the court is every automobile has that type of a sensor for its crankshaft and its timing shaft. That's exactly what keeps your automobile in time. And as to evidence in the record that would show that even though that appears on the second invention disclosure and not on the first, that was a matter of simply ordinary skill and not... Once again, Your Honor, I have to go back to the board's own decision in the related application. That is something that having figured out or determined how one might get data on the fabric motion to use for controlling the machine, the interconnections with the machine would depend largely on what the machine is. If you had an electronic device that was using servo motors or something of that nature, it might already have that. If you had an older machine that was largely mechanical with what you may remember as being leather belts driving the sewing needle, then you may need to add it. But by itself, the problem solved, the invention, was how can you move a fabric at varying rates in different positions and collect data. And that was shown by the September test that he ran for his sons and then subsequently in all the information he provided to the patent attorney. And that information contained enough data to show that he had a full conception of how to collect data and control a sewing machine. And I've been advised that I'm running into my rebuttal time. Okay, very good. We'll save the rest for you, Mr. Freeman. May it please the court. The board got it right. Its legal conclusions are correct and its factual conclusions are supported by substantial evidence. And it's this latter point where I'd like to spend my time this morning. That's because the board's conclusion, the board had alternative bases for its conclusion. It examined all the evidence, took it as true, weighed it, and found as a matter of law that it was insufficient to establish conception. But it also separately examined all those pieces of evidence and found them unreliable. And you know what? I'm just going to tell you I disagree with every one of those evidentiary holdings. So you better spend all your time on the first argument. The first argument being the... The first argument that accepting all the evidence as something that is able to be used is still legally insufficient. Because I don't agree with pretty much anything the board said when it threw out, well, you can't rely on this and you can't rely on that because this one came from this one and that one came from... No. I didn't find any of that persuasive. But you're lucky because, as you said, they said, well, even if you take all the evidence in, this is the outcome. So why don't you keep all of your focus on that. Let's just assume all the evidence is in. And tell me why all that evidence is not sufficient to establish its conception prior to October 8th of 2002. Okay, well, it's pretty limited evidence. It's this image over here of Exhibit 2006, which is the sketch, the diagram that is dated. There are four pre-Watabe documents. Let's go back. None of them have any stitching to connect them together because we don't have any testimony from the inventor. So we have to decide whether conception's been established on the documents alone. These documents establish what's going on inside the mind of the inventor, that he had a definite and permanent idea of the complete and operative invention. There's a picture on 781. What is the picture on 781, the free motion machine? What does that show me? I think that it's the picture in the upper right-hand column that you were just talking about. So that's one of the four pre-Watabe documents. Right. That's 779 through 782 are the four pre-Watabe documents. The sum total of the evidence that anti-dates Watabe are these four documents. What's missing in 781? What about this claim isn't disclosed in 781? The circuit. What we knew before, what was in the prior art, was an optical sensor, a mouse. That's in the prior art. Sewing machines in the prior art. The way to connect those two, that wasn't in the prior art. That was in Watabe, but it wasn't in the prior art. And he had to come up with a way to connect them. Where in Watabe does it explain how to connect the two? Show me in Watabe. It explains in... You just said that's in Watabe. Right, right, right. Paragraph 21 and 22. I just wanted to say that it's a fully formed patent application, so it's all throughout. But paragraph 21 and 22 is where it goes into great detail. Paragraph 21. The second interrupt procedure of the microcomputer. Correct. And so this is the rotational speed end of the sewing machine motor 32 is calculated from variable L that indicates the distance of the movement of the fabric. So this disclosure is... What? How would you explain what this disclosure tells me that's missing from this picture? Well, it provides a calculation there at the bottom in paragraph 21, and it talks about how that information calculates. It communicates with the motor and with the shaft and tells it how many rotations and revolutions to make in response to the changing speed and the detected speed that's changing. Versus... Yes, I'm sorry. Keep going. Versus Mr. Volpe's argument, which was a pedal that says go fast, go slow, which is really nothing more than a potentiometer. Give it more juice, give it less juice. A circuit to connect that to a shaft is something... Boy, are you young. I'm sorry? I said, boy, are you young. It used to be done with a leather pulley. But the point being, that's very simple. That's something very simple. Yes, pedal adjustment was in the prior art, certainly. But the technology to connect pedal adjustment with needle speed is rudimentary. The technology to connect a varying rate of detection that's constantly changing and constantly being recalculated, that wasn't in the technology. And the record shows, if we're going to believe everything in the record, that it was tough. It took him a long time to figure it out. He came up with a quote-unquote proof of concept that he showed at the party. What does 782 show? That was... We're not going to disagree on the four documents, I'm sure. So what does 782 add? Is that just the detection mean, that flowchart? Or does that flowchart go to the control circuit mean? Well, I think that that flowchart shows nothing more than what goes on inside a mouse. That's what goes on inside a computer mouse. It takes these measurements and it constantly reassesses them and it kicks out an impulse. And that's why you see the cursor move on your screen when you move it because it's performing this calculation. To take that information and then turn it into, through circuitry, to communicate with the stitch head or the needle to go faster or slower in response to the detected motion, that's something that wasn't done until Watabe and the inventor himself had considerable difficulty making it happen. It wasn't until November 2015. The hard thing for me is there's no circuitry disclosed in Watabe. I mean, there's no circuitry. All there is in Watabe is this disclosure of some of these variables and the way to make a couple calculations which are so simple. I mean, L equals one over two times one half. I mean, that's not really complex electrical engineering technology. That's what I'm just wondering because the disclosure in Watabe doesn't seem to be at some high level of detail or great addition to the technology. So when we talk about a circuit, I'm not meaning it necessarily in terms of a circuit diagram, but I'm meaning it in terms of explaining in some detail how you get the needle to change its speed in response to the detected motion. That's not something that's evident in any of these four pre-Watabe documents. Doesn't this just say, doesn't Watabe just say the microcomputer will just do it based on counting the number of rotations of the motor? No. It provides this calculation and the calculation provides a way... What calculation? Well, the one you just recited. Well, that's just an example of one rate, isn't it, that you could use? I don't know. I mean, maybe I don't know. I might not. Look, I'm... The calculation is N, which is... Rotational speed of the sewing machine motor. So that's, like I said, rotation. Yeah, and L is the accumulated... Is that L? No, I think that's 1. That's L. It's L. It's capital L, which is discussed in the first interrupt procedure. Oh, you're at N equal L over A times 2T. I was at the lower one, which is N equal 1 over 2 times 1 half. I'm sorry. And L is fairly complex, and that's something that's also not disclosed. You have to set a time frame, and there's a summing that has to take place, and you sum every... None of that's disclosed in here. It is. Where is that disclosed? That's in the first interrupt procedure, paragraph 18 through 21. That's talking about L. That's talking about accumulating the time. Okay, dumb question, but isn't this first interrupt procedure just measuring the distance of the movement of the fabric? It is. It's measuring it and accumulating it through the sensor that's detecting it. It's a good question. What do you mean accumulating it? Adding it up. It's coming up with this term L. So it's coming up with a number that is L. It's the amount of accumulated distance. So if the first distance is too small, it holds on to that and adds the next measurement, because otherwise you could go forever with a whole series of effectively dealing with bunching. It's a time... interval. So there's an interval that you set and it takes, you know, 1500 I believe it said in here somewhere, pictures per second. And it's... in order to decide, you've got to take some number of those, some subset, and see how much it moved in that subset of time. And that's what L is. And you can set L to be, I believe in the example it's set as one. So one second. And in that time, you add up what happened. I'm sorry, I misspoke. L is the distance. Time is T1. T1 is referred to in the first interrupt procedure as well. I guess the hard thing for me is this first interrupt procedure for example, it just says, okay, you've got a sensor and what you're going to be measuring is the shift in the image of the sensor, taken by the sensor as it moves. Why isn't... Let me try to answer that. Because what you just described is what a mouse did and does. That's what an optical mouse does. I know, and that's what's disclosed at 782, right? At a minimum. Right. That flowchart. No dispute about that. He took a mouse owner's manual or user's manual and more or less copied the data that's in it. That flowchart just represents what a mouse does. Yes, I guess my... You're agreeing with me, which makes it seem like maybe I don't understand what I'm thinking, which is, isn't based on his disclosure, isn't that good enough to really be comparable to what is in fact disclosed in Watabi? I'm just trying to figure out what really leap is there in Watabi? What important thing does Watabi tell us about how to do this that isn't present in the documents that he was able to show? It's this calculation, this second interrupt procedure in 21 and 22. Because that's the way that you get the needle speed to change in response to the changing motion detection. But documents to establish conception, to prove what went on inside the mind of an inventor, I believe that's a different standard. Let me just say, just so you understand, and don't abandon your discussion, not everybody up here necessarily believes that the evidentiary rulings were erroneous. That might provide me a good transition point, if I may. Because I do believe that provides an alternative basis of affirmation. It's a direct shot. You don't even have to get into any of this legal sufficiency. Every single bit of the relevant evidence was analyzed by the court and found to be unreliable. I won't spend my time there. I'll go to another alternative basis for affirmation, and that's that Bernina didn't carry its burden of showing reasonable diligence below. But that was not decided by the court. It was not reached. But the record's closed. Can we spend just one minute, I guess, on the reliability of the evidence? Certainly. What's unreliable about the evidence since a lot of it, I think, without meaningful dispute, made its way into essentially contemporaneous, not pre-October 8th, but documents that were created and eventually made their way into the February 20, 2003 provisional application. There's a lot of surrounding circumstances that make very plausible that, well, these four documents and so on and, indeed, the narrative about the birthday party in August, if that's what it was. Well, it's the dates on them. We don't have any basis to know that they are, in fact, the dates on which they're created. There was his letter later in May of 2009 where he couldn't say with certainty that they were the dates on which they were created. There's the screenshot that shows that the dates shown on the front of the computer drawings was different than the last modified date. That calls into question the veracity of the dates of creation of these documents. Well, but, okay, but time out. I'll make sure I'm not missing something. One of the things the Board said, and they said this critically, and this is part of why I was so intensely bothered by it, is one of the reasons they said the date is not adequate is, for example, on the September 29, 2002 date on the document. The Board says, well, we don't know it was really September 29, 2002 because Mr. Kerner doesn't say he prepared the document on that day. He says he prepared it on or before September 29, 2002. Well, I find that to be a little frustrating, right, because before September 29, 2002, that doesn't help you. And, I mean, look, have you ever prepared a document? I mean, sometimes you sit down and you start writing it and the end date you put on it is the final date that you completed it. I just don't see how his statement that he worked on it, he worked on it in advance of September 29, 2002 and finished it on that day means that somehow it shouldn't be credited with at least a September 29, 2002 document. I think if he were alive and provided testimony, maybe so. Maybe we could take all this in and the totality of the circumstances.  he prepared it on or before September 29, 2002. That's not sworn testimony. That's a letter from 2009 and it wasn't subject to any kind of cross-examination. We don't have any sworn inventor testimony in this case. In a case with sworn inventor testimony, maybe we take documents like this, maybe we process them through a little bit of a relaxed filter. In this case, we have to rely on the documents and the documents alone to establish what went on inside the mind of the inventor. And the document has a date on it. The document. What evidence is there that it doesn't have that date? What evidence is there that it doesn't have that date? What could have happened is in 2009, he gets sent back by his lawyer. His lawyer says, go find your information. He digs through his stuff. Maybe he finds these documents. They're not dated. And he says, I know what's here. There's no evidence that he, later in time, put the date on them. It's their burden to establish certainty, however. So the point, I'm just running through a hypothetical. And I'm not calling him a crook. I'm saying, this very well could have happened. He says, I'm positive. I know. I know I created it on this date. I'm just going to put that in there. No evidence that you're just making stuff up at this point. There is no evidence whatsoever to even dately support that. Well, the burden is on the other side to establish. And they put proper to document with a date on it. And when you look at least at the photocopy, it's not like the date appears that it was written in a different color pen or had a different even amount of pressure in writing. I mean, the date looks exactly like the rest of the dates. The best answer I can give you is that we're held to the rules of evidence in these proceedings. And they have to pass muster under the rules of evidence. And there's nothing to authenticate it. It doesn't have anything to verify that it is what it purports to be, which is a document that was created on that date. You're challenging the foundation. Correct. And had the board ruled on my motion to dismiss and granted it, we'd be reviewing that for abuse of discretion, which is a pretty relaxed standard. With that,    Mr. Freeman. Mr. Volpe, do you have a little bit of time left for questions? Yes, I do. Thank you, Mr. Freeman. Mr. Volpe, do you have a little bit of time left for rebuttal? Oh, you're not Volpe. Yes, you have a little bit of time left for rebuttal. I'm sorry, Your Honor. I thought you said that Parrish had time left. Just a couple of quick things, Your Honor. I want to go back to the 782, the 929 figure again. And I think one of the things that was overlooked in counsel's argument here is the calculation here goes not just to a mouse. It goes specifically to when you set the stitch length, the box there indicates that. Right. Let me just say, it seems to me that what the board said was right near the bottom between compare stitch length versus X squared plus Y squared and stitch. That's where   happen occurs. And that is what is not shown. There's no control circuitry and without the conception of how to do that, there's no control circuitry to do this little step. What is it? SL, oh, SL less. Right? So if the stitch length is less than the X squared plus Y squared, then you go ahead and stitch. Otherwise, you loop back around to the top and you accumulate the distances until you get an X squared plus Y squared greater than the stitch length. That's what's missing right there. But the point is, Your Honor, that is a point at which it is the state of the art. It's one of skill in the art at that point. But that's what the board said was missing as conception. And is it not your burden to show that is that a factual question? The circuitry  that stitch was so much a state of the art that it doesn't have to be described. That's right, Your Honor, because the sewing machine itself is what would produce the stitch. Are you agreeing with him that that's a factual question? Yes, Your Honor. It would be. It's certainly a factual question, but at this point we believe that because it was an item of state of the art that there was no evidence required such as expert evidence that the board referred to because the sewing machine itself that was capable had the motor that was capable of pushing a stitch a certain length. That all existed. All that was what was required at this point was to know what was the information that you were going to transmit to it. And to the extent that circuitry and I believe Judge Moore pointed it out if you look at the figure two and three at 513 and 514 of Watabe, Watabe never says how to do any of this. Watabe says you take an image and if it doesn't show up then you take another image and you use that as your base image. And then you wait until you get other images. But Watabe never says anything about whether you put images through a shift register whether you're somehow putting a data stream together on how many pixels they are. So to the extent that Watabe that Watabe teaches that circuit as the final written decision says then the 446 patent or the 2006 exhibit does as much to teach it. And if there are no other questions on that I have just one other point I want to make Your Honor. As far as the reliability of the evidence goes counsel is correct that we gave as part of the evidence we produced a screenshot from the computer which showed a different date. And that was done because when we had Mrs. Kerner after he was deceased she went through his records. And that was part of the record that he had made with that. And that was why it was produced. That was not something that was subsequently discovered. That was actually part of Mr. Kerner's records at the time. I think that was clear from the record. Thank you. I thank both counsel for their arguments. The case is taken under submission. Thank you. All rise. The honorable court is adjourned until tomorrow morning at 10 a.m. You may be dismissed.    This is a  adjourn the  We'll  motion.     Good morning. Good morning. Good morning. I would like to ask the defense to please come forward to the podium. Thank you. I think I hear            forward to the podium. Thank you. I would like to ask the defense to come forward to the podium.